UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MILADYS MORALES,                              :

              Plaintiff,            :

       -against-                :  **REPORT AND RECOMMENDATION**

COMMISSIONER OF SOCIAL SECURITY,     :      10 Civ. 8773 (BSJ)(KNF)

             Defendant.            :
-------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE BARBARA S. JONES, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

     Miladys Morales ("Morales") commenced this action <u>pro se</u> against the Commissioner of

Social Security ("Commissioner"), seeking review of an administrative law judge's ("ALJ")

decision finding her ineligible for Supplemental Security Income ("SSI") payments, under Title

XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-1383f.  The Commissioner filed an

answer to the complaint, followed by a motion for judgment on the pleadings, pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.  Thereafter, an attorney entered an appearance on

behalf of Morales and filed a cross-motion for judgment on the pleadings.  Before the Court are

the parties' motions for judgment on the pleadings.

## BACKGROUND

***Administrative Procedural History***

     On December 17, 2007, Morales filed an application for SSI benefits, which was denied.

(Tr. 55-60).  A hearing before an ALJ was conducted on March 12, 2009.  (Tr. 34-52).  On April

7, 2009, the ALJ found that Morales was not disabled.  (Tr. 19-33).  On September 9, 2010, the

1

Appeals Council denied Morales's request for review of the ALJ's decision, making the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-5).  This action followed.

***Non-Medical Evidence***

Morales was born in the Dominican Republic, where she completed high school, and

moved to the United States in 1986.  (Tr. 38, 47).  At the time of the hearing, Morales was 49

years old and testified that she spoke very little English.  (Tr.37-39).  According to Morales, she

tried to learn English but could not concentrate.  (Tr. 48).  Morales testified that, in 1995, she

attended a community college in the Bronx for a year and one-half.  (Tr. 48).  Morales also

testified that, in the past, she worked in a hair salon and cleaned apartments, but she stopped

working in 2007, after her daughter died.  (Tr. 39-40).  Morales stated that she had trouble

concentrating and was seeing a psychiatrist every month.  (Tr. 40-41).  Morales testified that she

had pain in her stomach, neck, left leg and lower abdomen.  (Tr. 41-42).  She indicated that she

had an operation on her left leg and was expecting to have an operation on her right leg.  (Tr.

42).  According to Morales, she was able to sit for up to 30 minutes at a time and could stand for

one or two hours.  (Tr. 42).  She could not lift or carry many pounds, since she suffers from pain

associated with her fibroids.  (Tr. 42).  Morales cooked and cleaned sometimes, and her sixteen-

year-old daughter helped her with shopping and laundry.  (Tr. 43).  Morales testified that she

was able to travel by bus, but could not take the subway, because it was too crowded and made

her anxious.  (Tr. 43-44).  Typically, Morales did not travel anywhere alone; instead, she would

have her daughter or a neighbor accompany her most of the time.  (Tr. 44).  Morales had trouble

sleeping and was taking Ambien, which would help her sleep for up to four hours at a time.  (Tr.

44-45).  She stated that she hears noises sometimes.  (Tr. 45).  Morales testified she had friends

in the building where she lived, but spent most of her day laying down and doing nothing.  (Tr.

2

45).  She was able to dress and bathe herself, although with a little difficulty.  (Tr. 46).
According to Morales, she was very forgetful, lost things, and she could not concentrate
sufficiently to watch television.  (Tr. 46-47).

    A vocational expert ("VE"), Melilssa Fass Karlin, testified at the hearing.  (Tr. 48-50).
She stated that Morales had worked as a hairstylist, which is light, skilled work with an "SVP
[specific vocational profile] of 6."  (Tr. 49).  The ALJ asked the VE to consider a hypothetical
person who is 49 years old, with the same past relevant work as Morales, who is unable to
communicate in English, has the ability to do light work, but is unable to carry out detailed or
complex instructions and is unable to work with the public.  (Tr. 49).  The VE testified that such
a person would not be able to perform her past relevant work, but could perform the work of an
assembler of small products, which is light, unskilled work, "with an SVP of 2."  (Tr. 49).  The
VE stated that 1,661 such jobs existed in the local and 39,482 in the national economy.  (Tr. 49).
The VE also testified that the hypothetical person could also do work as a marker, which is light,
unskilled work, of which 1,456 such jobs existed in the local and 85,202 in the national
economy.  (Tr. 49-50).  Moreover, the VE testified, the hypothetical person could work as a
machine tender, which is light, unskilled work of which 1,738 such jobs existed in the local and
68,311 in the national economy.  (Tr. 50).  The ALJ asked the VE: "If the worker were unable to
maintain attention and concentration for more than 30 minutes at a time, how would that impact
on the jobs?"  (Tr. 50).  The VE responded: "They could do the work I identified or any work in
the national or regional economy."  (Tr. 50).  The ALJ also inquired whether the VE's testimony
was consistent with the way in which the jobs mentioned are described in the Dictionary of
Occupational Titles ("DOT"), and the VE responded: "Yes, Judge."

***Medical Evidence***

<u>*New York Presbyterian Hospital*</u>

On June 9 and 13, 2006, Morales was seen at the New York Presbyterian Hospital.  (Tr. 173-74).  She complained of chest pain, dizziness and palpitations, and reported a strong family history of heart disease and the recent death of her seventeen-year old daughter.  (Tr. 173-74).  A stress test was performed; it revealed, after eight minutes, chest pain and a drop in Morales's blood pressure.  (Tr. 173).  On June 13, 2006, a cardiac catheterization was performed, which revealed normal coronary arteries and normal systolic left ventricular function.  (Tr. 173).  The diagnosis was atypical chest pain with possible anxiety.  (Tr. 173).

<u>*F.E.G.S. Lenox Hill Hospital*</u>

On November 1 and 8, 2007, Morales was seen at the F.E.G.S. Lenox Hill Hospital.  (Tr. 233-45).  On November 1, 2007, she was seen by a social worker, Nancy Diaz.  Morales reported a long history of depression with multiple hospitalizations after she found her seventeen-year old autistic daughter dead.  (Tr. 237).  She also reported auditory and visual hallucinations in the past, but denied having them at that time.  (Tr. 237).  Morales was taking psychiatric medication and seeing a psychiatrist every two weeks.  (Tr. 237).  She reported feeling depressed, having little interest or pleasure in doing things, trouble sleeping, feeling tired and trouble concentrating nearly every day.  (Tr. 238).  She also stated she could do laundry, make her bed, dress herself, read, watch television and take care of her personal hygiene.  (Tr. 239).

On November 8, 2007, Dr. Nana Alvazi ("Dr. Alvazi"), a physician at Lenox Hill Hospital, examined Morales.  (Tr. 242-45).  Morales had a normal station and used no assistive devices, but walked with a limp.  (Tr. 243).  She wore a brace and had a scar from surgery on her

4

left heel that was healing.  (Tr. 243).  Dr. Alvazi noted that Morales had a limited range of motion in her left ankle and paraspinal tenderness along her entire spine.  (Tr. 243).  Morales reported that the pain in her left foot varied from six to ten on a one-to-ten scale.  (Tr. 243).  Dr. Alvazi diagnosed Morales as follows: status post-left-heel surgery, uterine fibrosis and a large ovarian cyst, esophagitis, gastritis, possible coronary artery disease, and major depression and post-traumatic stress disorder.  (Tr. 245).  She recommended bereavement group psychotherapy. (Tr. 245).

### North General Diagnostic and Treatment Center

Morales was treated at the North General Diagnostic and Treatment Center ("NGDTC") from 2006 through 2008.  (Tr. 136-57, 213-32, 246-315).  Dr. Daniel Pilowsky ("Dr. Pilowsky"), a psychiatrist, noted on July 12, 2007, that Morales "remained moderately depressed and very anxious with insomnia and a variety of psychosomatic symptoms such as headaches and rigidity of the neck muscles."  (Tr. 297).  On November 29, 2007, Dr. Pilowsky completed a Treating Physician's Wellness Plan Report.  (Tr. 223-26).  Morales was diagnosed with a major depressive disorder and a generalized anxiety disorder, and she responded partially to her depression treatment.  (Tr. 223).  Dr. Pilowsky stated that Morales was "[t]emporarily unemployable," but that the following six months may show whether her condition should resolve.  (Tr. 226).

On December 4, 2007, when Morales visited NGDTC, she complained of left-heel pain. (Tr. 141-42).  Morales had undergone surgery to remove a heel spur, on September 24, 2007, and had been prescribed a controlled-ankle-motion ("CAM") walker, which she had stopped using two weeks before visiting NGDTC on December 4, 2007.  (Tr. 141).  Morales was instructed to resume using her walker, prescribed Motrin and instructed to follow-up in two

weeks.  (Tr. 142).  On December 18, 2007, she returned to NGDTC using her walker, but admitted that she had been wearing her normal footwear during the previous week.  (Tr. 139).  An examination was conducted; it revealed that the surgical area on her left foot had heeled well.  (Tr. 140).  Although Morales reported pain in her ankle from the walker and mild pain in her heel upon palpation, she stated that her pain was "much better" than it had been prior to the surgery.  (Tr. 140).

On January 15, 2008, Morales was seen for continued pain in her left heel.  (Tr. 137-40).  An examination was performed, and she had pain on palpitation in the left ankle and heel.  (Tr. 138).  Morales received injections to her left ankle and heel, which relieved her pain.  (Tr. 138).  A Lidoderm patch, for topical pain relief, and a non-steroidal anti-inflammatory medication were prescribed for Morales.  (Tr. 138).

On April 28, 2008, Morales underwent pelvic surgery and her treating physician directed that she be excused from work for one month.  (Tr. 213).  She was prescribed medication and a Foley catheter until her next office visit.  (Tr. 214).  Morales was advised to avoid heavy lifting and strenuous exercise.  (Tr. 214).

On June 19, 2008, Dr. Blanche Skurnick ("Dr. Skurnick") completed a Physical Evaluation form.  (Tr. 281).  On examination, Morales appeared well developed and groomed and had tenderness in her abdomen.  (Tr. 281).  Dr. Skurnick's impression was that Morales was "basically [a] healthy woman" with major depression, urinary tract infection, gastritis, constipation and deconditioning.  (Tr. 281).

### *Dr. Louis Tranese*

On February 20, 2008, Dr. Louis Tranese ("Dr. Tranese") performed a consultative orthopedic examination of Morales.  (Tr. 182-85).  Morales reported that she was able to bathe,

dress and groom herself on a daily basis.  (Tr. 182-83).  Dr. Tranese noted that Morales appeared to be in no pain at the beginning of the examination and became tearful soon after the examination began, explaining she was sad because of the loss of her daughter.  (Tr. 183). Morales presented with a left lower extremity CAM walker and straight cane and was unable to walk on her heels and toes without difficulty, secondary to left ankle and heel pain.  (Tr. 183). She was able to squat fully, but reported left ankle pain.  (Tr. 183).  Morales's station was normal and her gait was antalgic if she walked without her walker and cane.  (Tr. 183).  Dr. Tranese noted that Morales needed no help changing or getting on and off the examination table, and she was able to rise from a chair without difficulty.  (Tr. 183).  On examination, Morales had full strength and range of motion in her cervical spine and upper extremities.  (Tr. 183).  She had full manual dexterity and grip strength.  (Tr. 183).  An examination of Morales's thoracic and lumbar spines was normal, and a straight-leg-raising test was negative.  (Tr. 183-84).  Morales had full muscular strength in her lower extremities and a full range of motion in her hips, knees and ankles.  (Tr. 184).  No joint effusion, inflamation, or instability in the left heel or ankle was observed, and Morales's surgical scar was well healed.  (Tr. 184).  The remainder of Morales's bilateral lower extremity joints were unremarkable for effusion, inflamation or instability.  (Tr. 184).  Dr. Tranese diagnosed a history of left-heel surgery with complaints of persisting episodic left ankle and heel pain, and depression.  (Tr. 184).  Dr. Tranese stated that Morales's prognosis was stable and she "may have moderate limitations with stair climbing and ambulating extended distances and mild to moderate limitations with standing for long periods."  (Tr. 184).  Dr. Tranese found no limitation in sitting and no other physical functional deficit.  (Tr. 184).

### _Dr. Renee Ravid_

On February 26, 2008, Dr. Renee Ravid ("Dr. Ravid") performed a psychiatric

consultative examination of Morales.  (Tr. 186-88).  On examination, Morales's mood was

labile, and she burst into tears frequently.  (Tr. 186).  Morales reported that she had fears, such as

when she is in enclosed spaces, and experienced auditory hallucinations.  (Tr. 186-87).  Dr.

Ravid noted no evidence of perceptual disturbance during the interview.  (Tr. 187).  Morales was

alert and oriented to person, place and time.  (Tr. 187).  Dr. Ravid noted that Morales's recent

memory was somewhat impaired, and her remote memory was grossly intact.  (Tr. 187).  Dr.

Ravid observed that Morales appeared to have low average intellectual functioning, and her

insight and judgment were limited.  (Tr. 187).  According to Dr. Ravid, Morales's allegations of

depression were consistent only in part with the examination findings, because she was not fully

cooperative during the testing.  (Tr. 187).  Dr. Ravid opined that Morales's difficulties with

relatively simple tasks, such as counting backwards from ten, appeared excessive in light of her

high school education.  (Tr. 187).  Similarly, her difficulties with simple computations appeared

to be excessive as she was able to subtract correctly a more difficult problem, but was unable to

perform a simple addition.  (Tr. 188).  Dr. Ravid also noted that Morales's report that she did not

know the colors of the United States flag was highly unusual.  (Tr. 188).  According to Dr.

Ravid, the results of the examination could not be used to document any specific vocational

limitations.  (Tr. 187).

### Emma L. Bowen Community Service Center

Morales was treated at the Emma L. Bowen Community Service Center, a.k.a. Upper

Manhattan Mental Health Center, Inc., from March 2008 to February 2009.  (Tr. 316-61, 464-

67).  On March 7, 2008, Morales was seen by a social worker who noted that she was oriented to

time, place and person, and her appearance and relatedness were good.  (Tr. 346).  Her speech

was soft but coherent and her attitude was good.  (Tr. 346).  Although Morales's mood was

anxious and depressed, her affect was appropriate, thought process logical and judgment and insight were good.  (Tr. 346).  Morales reported auditory and visual hallucinations.  (Tr. 346). Her immediate, recent and remote memory were fair, intelligence average and impulse control was fair.  (Tr. 347).

On March 25, 2008, Dr. Andres Orozco ("Dr. Orozco") completed a psychiatric assessment of Morales.  (Tr. 335-40).  On examination, Morales's behavior was calm, her speech slow, affect labile, mood dysthymic and anxious, and her thought process coherent.  (Tr. 337). Morales showed no evidence of delusions, and she reported auditory hallucinations, but no suicidal or homicidal ideas.  (Tr. 337-38).  Morales's attention, concentration and memory were fair and her immediate, recent and remote memory intact.  (Tr. 338).  Dr. Orozco noted that Morales's general knowledge, calculation, thinking capacity and impulse control were adequate, while her insight and judgment were fair.  (Tr. 388-89).  Dr. Orozco diagnosed major depression and assigned Morales a global assessment of functioning ("GAF") score of 55.  (Tr. 339).  On October 16, 2008, Dr. Orozco noted that Morales presented with "multiple somatic complaints and menopause symptoms which make her feel unstable" and her "mood is depressed and affect labile."  (Tr. 325).

On January 24, 2009, Dr. Orozco and a therapist, Raymond Hall ("Hall"), completed a review of Morales's treatment plan.  (Tr. 320-22).  Although they indicated that Morales remained depressed, Morales's GAF score was 60, and she was assessed as having moderate limitations in her health, social and interpersonal activities, educational and vocational abilities, money-management skills and leisure activities.  (Tr. 320).  The review indicated that Morales made moderate progress toward her treatment goal, and it was recommended that she continue to obtain psychotherapy and take medication.  (Tr. 321-22).

On February 18, 2009, Dr. Orozco completed an updated psychiatric evaluation of Morales. (Tr. 316-18). He noted that Morales's mother died of pneumonia in December 2008. (Tr. 316). Morales's social and vocational functioning was described as limited. (Tr. 316). Dr. Orozco stated that Morales's general attitude was sad, her speech slow, her mood somber and affect labile. (Tr. 317). Morales's thought content, perceptual abilities, cognitive functioning, impulse control and insight and judgment were within normal limits. (Tr. 317-18). Dr. Orozco determined that Morales's GAF score was 55 and recommended continued therapy and medication. (Tr. 318).

### Dr. Renato Giorgini

On March 11, 2008, Dr. Renato Giorgini ("Dr. Giorgini"), a podiatrist, completed a Treating Physician's Wellness Plan Report. (Tr. 224-25). He stated that Morales's surgery was successful and her left heel was pain free. (Tr. 224). Dr. Giorgini noted that Morales needed to continue physical therapy and might be able to return to work by July 2008. (Tr. 224). He indicated that Morales was "[t]emporarily unemployable" and could not tolerate prolonged standing, despite improvement with therapy. (Tr. 224).

### Dr. T. Inman-Dundon

On April 8, 2008, Dr. T. Inman-Dundon ("Dr. Inman-Dundon"), a psychologist, reviewed the medical evidence on the record and completed a psychiatric review technique form and a mental residual functional capacity assessment of Morales. (Tr. 189-202, 209-12). According to Dr. Inman-Dundon, Morales had mild limitations in the activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence or pace. (Tr. 199). No sufficient evidence existed to establish any episodes of deterioration. (Tr. 199). Dr. Inman-Dundon noted that Morales's credibility was questionable,

10

and the results of her consultative examination appeared exaggerated.  (Tr. 211).  In Dr. Inman-Dundon's opinion, Morales was capable of performing rote or repetitive work that did not involve working with the general public.  (Tr. 211).

### Evidence Submitted to the Appeals Council

Following the ALJ's hearing on April 7, 2009, Morales submitted additional evidence to the Appeals Council, consisting of: (1) the records from NGDTC; (2) a letter from Hall; and (3) a checklist indicating she had been scheduled for foot surgery.  The additional records from NGDTC indicated that a December 17, 2007 ultrasound of Morales's pelvis revealed a Nabothian cyst and otherwise an unremarkable study of the uterus and adnexa.  (Tr. 455).  A February 8, 2008 examination of Morales's left heel revealed mild swelling and tenderness (Tr. 461).  Exercise therapy, hot packs, ice, massage and stretching were recommended to increase the heel's strength and reduce pain.  (Tr. 459).  On May 10, 2008, Morales went to the NGDTC emergency room, due to lower abdominal pain, and requested that her Foley catheter be removed.  (Tr. 364-70).  The May 10, 2008 examination of her abdomen was normal.  (Tr. 366).  An examination of Morales's left ankle, performed on August 26, 2008, revealed no open lesions, edema, or erythema, but revealed mid-foot pain and pain on palpitation of the lateral left ankle.  (Tr. 403-04).  During the August 26, 2008 examination, Morales reported that she had left ankle pain since September 2007.  (Tr. 403).  She was prescribed Celebrex and a new ankle support.  (Tr. 403-04).  A February 9, 2009 x-ray of Morales's pelvis was normal.  (Tr. 386).  A colonoscopy, performed on March 2, 2009, was normal.  (Tr. 373-77).  An esophagogastroduodenoscopy, performed on the same day, showed evidence of non-erosive esophagitis, a possible small sliding hiatal hernia and erosive gastritis.  (Tr. 380-81, 389-90).

On July 31, 2009, Hall prepared a letter, stating that Morales had been seen for biweekly

11

individual psychotherapy since March 26, 2008.  (Tr. 464).  He stated that Morales's principal

diagnosis continued to be a major depressive disorder, which caused a lack of energy, poor

concentration, difficulty sleeping and pervasive feelings of guilt and loneliness since the death of

her daughter.  (Tr. 464).  According to Hall, Morales had been fully compliant with her

treatment routine, but continued to struggle with daily routine tasks.  (Tr. 464).  He stated that

with a gradual increase of Morales's medication dosage she would be able to manage her

"unrealistic fears."  (Tr. 464). An undated checklist form indicates that Morales had been

scheduled for unspecified foot surgery on August 3, 2009.  (Tr. 467).

### The ALJ's Decision

On April 7, 2009, the ALJ rendered his decision.  (Tr. 25-33).  He stated that the issue

was whether Morales was under disability, as that term was defined in SSA for the purpose of

determining eligibility for SSI under Title XVI of the Act.  (Tr. 25).  The ALJ found that

Morales: (1) had not engaged in substantial gainful activity since December 17, 2007, the date of

her application for benefits; (2) has the severe impairments of major depressive disorder,

generalized anxiety disorder and status post left heel surgery, which caused more than minimal

limitations in her ability to perform work-related activities; (3) does not have an impairment or

combination of impairments that meets or medically equals one of the impairments listed in 20

C.F.R., Part 404, Subpart P, Appendix 1; (4) has the residual functional capacity to perform light

exertional work, which does not require the ability to carry out complex or detailed instructions

or work with the public; (5) is unable to perform any past relevant work; (6) was forty-seven

years old on the date she filed her application; (7) has at least a high school education and is able

to communicate in English; and (8) can perform jobs that exist in significant numbers in the

national economy, considering her age, education, work experience and residual functional

capacity. (Tr. 27-32). More specifically, the ALJ determined that, although Morales has a physical impairment that is severe, the record does not show clinical signs or diagnostic findings that meet or equal the degree of severity of a listed impairment. (Tr. 27). The ALJ also found that, considered singly or in combination, Morales's mental impairments do not meet or medically equal the criteria of the listings because they do not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration. (Tr. 27-28). Concerning Morales's residual functional capacity, the ALJ determined that she has the physical ability to lift and carry, occasionally, up to twenty pounds at a time, lift and carry, frequently, up to ten pounds at a time, walk and stand up to six hours out of an eight-hour day, push and pull light weight objects and bend and stoop occasionally. (Tr. 28). According to the ALJ, Morales retains the mental functional capacity to meet the basic work-related demands of competitive, remunerative, unskilled work, such as understanding, remembering, and carrying out simple instructions, using judgment to make simple work-related decisions, responding appropriately to supervision and usual work situations and dealing with changes in a routine work setting. (Tr. 28).

Upon consideration of the entire record, the ALJ concluded that Morales's medically determinable impairments could reasonably be expected to cause the symptoms alleged by her. (Tr. 30). However, the ALJ found that her statements concerning the intensity, persistence and limiting effects of the symptoms were incredible to the extent they are inconsistent with the ALJ's residual functional capacity assessment. (Tr. 30). The ALJ stated that the evidence showed that Morales's foot impairment was corrected and she required no further physical therapy. (Tr. 30). Moreover, no evidence of any psychotic symptoms in an evaluation setting, and no signs of a thought disorder existed, and the weight of the objective evidence indicates that

Morales has only moderate functional limitations. (Tr. 30). The ALJ also concluded that Morales's subjective complaints of disabling symptoms are exaggerated and cannot be reasonably accepted. (Tr. 30). He found that Morales was not a credible witness. (Tr. 31). The ALJ explained that Morales started crying at the hearing before anyone said a word and she cried repeatedly during the hearing, including at times when the matters discussed lacked any apparent emotional impact. (Tr. 31). Furthermore, although Morales first testified that she did not speak English, she later said she could understand "maybe a little thing." Nonetheless, the ALJ observed on several occasions that Morales began answering a complex question without waiting for the question to be translated for her. (Tr. 31). Similarly, although Morales attributed her debilitating mental condition to her sadness over the death of her daughter, she volunteered details about her daughter's death repeatedly even though she was never asked about it. (Tr. 31).

The ALJ rejected the treating physician's opinion about Morales's inability to work because it had no factual basis and he gave more weight to the orthopedist's opinion, which was based on a detailed physical examination. (Tr. 31). The ALJ adopted the mental limitations assessments made by Morales's treating psychiatrist, Dr. Pilowsky, and the Upper Manhattan Mental Health Center, Inc., and incorporated them in his residual functional capacity assessment. (Tr. 31-32). The ALJ concluded that Morales had not been under disability since December 17, 2007, the date of her application for benefits. (Tr. 33).

***Defendant's Motion for Judgment on the Pleadings***

The Commissioner contends that substantial evidence supports the ALJ's finding that Morales had the physical residual functional capacity for light work because the medical evidence shows that Morales's foot pain did not prevent her from performing the requirements of light work. Moreover, substantial evidence also supports the ALJ's finding that Morales had

14

the mental residual functional capacity for work that did not require carrying out complex or detailed instructions or working with the public, because the reports of the treating psychiatrists show that Morales had only moderate limitations in her social and vocational functioning. According to the Commissioner, the ALJ rejected properly Morales's complaints as incredible, due to the lack of corroborating medical evidence, her demeanor at the hearing and her exaggerated statements to the psychiatric consultative examiner.  Furthermore, Morales appeared with an assistive device only when she attended two consultative examinations arranged by the defendant and was not instructed to use it by her physicians.  The Commissioner maintains that the ALJ's credibility finding is entitled to deference.  Moreover, substantial evidence also supports the ALJ's finding that a significant number of jobs existed in the national economy that Morales could perform, based on the VE's testimony, and the evidence submitted to the Appeals Council was not contrary to the weight of the evidence in the record and does not provide a basis for disturbing the ALJ's decision.  The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence.

### Plaintiff's Cross-Motion for Judgment on the Pleadings

Morales contends that the ALJ's rejection of Dr. Giorgini's opinion, based on the lack of a factual basis, was erroneous because Dr. Giorgini's findings were based on his examination of Morales, and he stated that she had no ability to stand for prolonged periods of time.  According to Morales, the ALJ concluded erroneously that Dr. Tranese had found only mild limitations in Morales's ability to stand because Dr. Tranese found "mild to moderate limitations with standing for long periods" and stated that Morales would have moderate limitations ambulating for extended distances.  Thus, the ALJ failed to describe the consultative orthopedist's limitations conclusions accurately and fully, and he failed to explain how an individual with mild to

15

moderate limitations in the ability to stand and moderate limitations in the ability to walk could perform light work. Morales argues that the ALJ's conclusion that she is capable of performing light work is based on his incomplete review of the treating source records and his mischaracterization of the treating source evidence.

Morales contends that the ALJ erred in not discussing her physical abilities on a function-by-function basis before determining her residual functional capacity. Instead, Morales maintains, the ALJ "simply made a mechanical recitation of her physical abilities in the opening paragraph of his step four analysis," but failed to discuss her "stomach pain, back pain, psychosomatic symptoms, and their effects." Moreover, the ALJ erred in not taking into account Morales's non-exertional impairments before determining her residual functional capacity, because she testified "that she suffers from panic attacks, insomnia, psychosomatic symptoms, is unable to handle stress, and is obese," all of which are non-exertional impairments "directly linked to objective medical documentation." Furthermore, in addition to Morales's testimony that she is obese, the evidence shows she "suffers from low self esteem, low energy, and loss of desire to care for her."

Morales argues the ALJ failed to pose a hypothetical question to the VE that presented the full extent of her impairments, to wit, her "inability to travel, and the functional limitations of frequent panic attacks." According to Morales, the ALJ also erred when he relied on the VE's testimony because the VE did not provide authoritative citations to the DOT or any other source. The VE "did not give the specific vocational profile . . . of the marker and machine tender jobs," and "[t]here is no mention of a single 'machine tender' occupation in the DOT[;] [r]ather, there are 141 machine tender jobs for specific industries, each with varying degrees of strength, SVP, and general educational development levels." Additionally, "the assembler of small parts and

16

marker jobs require that an individual be able to print simple sentences containing subject, verb, object, and series of numbers, names and addresses, and speak simple sentences, using normal word order and present and past tense," and in his hypothetical, the ALJ stated the worker is unable to communicate in English.  The VE "failed to explain how a non English speaker could meet the writing and speaking requirements of these jobs."  Morales maintains that the VE's testimony is also contrary to established policy that the "ability to maintain attention and concentration for extended periods (approximately 2-hour segments) is one of the mental abilities needed for any job and is critical for the performance of unskilled work."  According to Morales, when the ALJ asked the VE "whether there is any impact of being unable to maintain attention and concentration for more than thirty minutes at a time on working," the VE testified that the hypothetical person "could do the work I identified or any work in the national or regional economy. . . . This testimony obviously contradicts the . . . . SSA rules because thirty minutes is far less than the required two-hour segment in the regulations, and a person with limitations cannot do *any* work in the national or regional economy."

Next, Morales argues that the ALJ committed legal error by failing to accord proper weight to the opinions of her treating physicians' reports and to explain what weight he accorded the reports.  Morales contends that the ALJ rejected erroneously Dr. Giorgini's opinion, referring to Dr. Giorgini's statements in his March 11, 2008 report that Morales was pain free and might be able to return to work in July 2008, because in the same report, Dr, Giorgini prescribed physical therapy for Morales, indicating that her "musculoskeletal impairments were not resolved."  Moreover, two days later, Morales reported that she had pain in her left dorsal ankle and left heel.  She did not return to work in July 2008, and she reported to her treating physician, on August 26, 2008, that the pain in her left ankle and foot was an eight on a one-to-ten scale.

17

Morales maintains that the ALJ disregarded improperly Dr. Giorgini's opinion that she could not tolerate prolonged standing.

Morales contends that the ALJ erred in not giving weight to Dr. Pilowsky's opinion that Morales was unable to work, given that Morales's depression and anxiety did not improve within six months, the period during which Dr. Pilowsky indicated Morales was temporarily unemployable.  According to Morales, six months later, in May 2008, her depression and anxiety did not improve and she continues to take medication, even today.  Moreover, the ALJ erred when he concluded that Morales's GAF score of 55 meant that she had "no more than moderate occupational limitations," because a GAF score of 55 means moderate symptoms, or moderate difficulty in social, occupational, or school functioning.

Morales argues that the ALJ also failed to explain the weight he gave to her treating physicians, Dr. Pilowsky, Dr. Giorgini and Dr. Orozco, and he failed in his affirmative duty to clarify the opinions of her treating physicians.  According to Morales, the Appeals Council "cursorily found that this new evidence did not provide a basis to change [the ALJ's] opinion;" it should have remanded the case to the ALJ to develop the record on her August 3, 2009 surgery further.  Morales contends that, neither the ALJ's determination to discredit her testimony nor his decision on her application are supported by substantial evidence; accordingly, the decision on her application for SSI benefits should be reversed.

***Defendant's Reply to the Plaintiff's Cross-Motion***

The Commissioner argues that the ALJ rejected properly Dr. Giorgini's statement that Morales was unable to return to work because that is an issue reserved to the Commissioner and the statement was not supported by clinical or objective findings, or by a functional assessment, as the ALJ noted.  The ALJ weighed properly Dr. Giorgini's opinion that Morales could not

stand for a long period of time, but found other evidence to be more convincing, such as Dr.

Tranese's assessment that Morales may have mild to moderate difficulty with prolonged

standing.  According to the Commissioner, the evidence demonstrates that, while Morales may

have had temporary restrictions concerning prolonged walking after her July 2007 surgery, these

restrictions did not last for at least twelve months, as required to demonstrate disability.  Since

the evidence shows that, by March 2008, Morales was pain-free and, by June 2008, basically

healthy, the ALJ had discretion to choose between medical opinions to resolve any genuine

conflicts in the medical evidence.

The Commissioner contends that the ALJ evaluated the opinions of Dr. Pilowsky and Dr.

Orozco properly and, contrary to Morales's contentions, he stated the weight he was according

those opinions.  Moreover, the ALJ evaluated properly the opinion of Dr. Tranese, not adopting

it entirely, but referring to it along with Morales's history of treatment when assessing her

residual functional capacity.  The Commissioner maintains that the plaintiff's argument that the

ALJ failed to provide a function-by-function analysis in his residual functional capacity

assessment is meritless because the ALJ made specific findings concerning Morales's ability to

perform various functions.  The Commissioner argues that the ALJ accounted for Morales's

mental impairments properly and was not required to find that Morales's obesity was a severe

impairment, as no medical evidence demonstrates that she had been diagnosed with obesity or

that her weight limits significantly her ability to do basic work activities.

According to the Commissioner, the ALJ relied on the VE's testimony properly because

his hypothetical question to the VE "matched exactly the ALJ's residual functional capacity

finding," and nowhere in his residual functional capacity assessment or anywhere else in his

decision did the ALJ find that the plaintiff was unable to take public transportation and suffered

19

from panic attacks.  The VE's testimony was not flawed because she failed to provide citation to

the DOT as no such requirement exists in the statute or regulations.  Additionally,

notwithstanding the ALJ's finding that Morales was able to communicate in English, even if the

VE erred in her testimony regarding the language requirement of the two jobs she listed as

suitable for the hypothetical person, she identified an additional job —machine tender—that did

not require communication in English.  The Commissioner contends that the Appeals Council

found properly that the evidence submitted to it provided no basis to change the ALJ's opinion

and was not contrary to the weight of the record evidence.  The ALJ evaluated Morales's

credibility properly as he observed her demeanor and behavior at the hearing and gave many

other reasons for not finding Morales credible.

## DISCUSSION

### *Legal Standard*

 "After the pleadings are closed—but early enough not to delay trial—a party may move

for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The court shall have power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is
> not disabled only if the factual findings are not supported by "substantial evidence"
> or if the decision is based on legal error.  Substantial evidence "means such relevant
> evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  "Even where the

administrative record may also adequately support contrary findings on particular issues, the

ALJ's factual findings 'must be given conclusive effect' so long as they are supported by

20

substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

Title XVI of the SSA provides benefits to "[e]ach aged, blind, or disabled individual who does not have an eligible spouse" and whose income and resources fall below a certain level. 42 U.S.C. § 1382(a). To qualify for disability benefits, an individual must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.912(a). SSA regulations establish a five-step process for determining a disability claim. See 20 C.F.R. § 416.920(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further. At the first step, the agency will find nondisability unless, the claimant shows that he is not working at a "substantial gainful activity." At step two, the [Social Security Administration] will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Social Security Administration] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be

21

> disabled.  If the claimant survives the fourth stage, the fifth, and final, step
> requires the [Social Security Administration] to consider so-called "vocational
> factors" (the claimant's age, education, and past work experience), and to
> determine whether the claimant is capable of performing other jobs existing in
> significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) ( internal citations

omitted).  "[T]he ALJ generally has an affirmative obligation to develop the administrative

record."  Melville, 198 F.3d at 51.  Additionally, in determining disability, the ALJ must adhere

to the regulations governing the evaluation of the severity of mental impairments, which "require

application of a 'special technique' at the second and third steps of the five-step framework, and

at each level of administrative review."  Kohler, 546 F.3d at 265 (citations omitted); see

20 C.F.R. §416.920a(a).  If the claimant is found to have a mental impairment, the ALJ must rate

the degree of functional limitation resulting from the impairment in four broad functional areas

in order to determine the severity of mental impairments : (1) activities of daily living; (2) social

functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  See

20 C.F.R. § 416.920a(c)(3).  If a claimant's mental impairment is severe, the ALJ then

determines if it meets or is equivalent in severity to a listed mental disorder.  See 20 C.F.R.

§ 416.920a(d)(2).  This is done "by comparing the medical findings about [the claimant's]

impairment(s) and the rating of the degree of functional limitation to the criteria of the

appropriate listed mental disorder."  20 C.F.R. § 416.920a(d)(2).  If the ALJ finds that the

claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to

any listing, [the ALJ] will then assess [the claimant's] residual functional capacity."  20 C.F.R.

§ 416.920a(d)(3).  The application of this process must be documented.  See 20 C.F.R. §

416.920a(e).

> [T]he written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §416.920a(e)(4).

In making his decision, the ALJ must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

Controlling weight is given to the opinion of the claimant's treating physician where the ALJ finds that "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 415.927(d)(2). When the ALJ does not give controlling weight to the claimant's treating physician's opinion, the ALJ applies the factors listed in the regulations, including: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the evidence supporting the treating physician's opinion; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other factors which tend to support or contradict the opinion. See 20 C.F.R. § 416.927(d). Whether the claimant is disabled, is for the Commissioner to determine. See 20 C.F.R. § 416.927(e).

> Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical

23

> or psychological consultant or other program physician, psychologist, or other medical specialist, as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the Commissioner].

20 C.F.R. § 416.927(f)(2)(ii).

> When determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.

> Genier, 606 F.3d at 49.

"When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7P, 1996 WL 374186, at *4 (July 2, 1996).

The regulations describe a two-step process of evaluating symptoms: (i) the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms; and (ii) if such an impairment exists, the ALJ must evaluate the intensity, persistence and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  See 20 C.F.R. § 416.929(b); SSR 96-7P, 1996 WL 374186, at *2 (Jul. 2, 1996).  In evaluating the intensity and persistence of the individual's symptoms, the ALJ must consider all available evidence as well as factors relevant to the symptoms, including: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication; (5) any treatment received other than the medication; (6) any measure used to relieve pain or other symptoms; and (7) any other

factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See 20 C.F.R. § 416.929(c).  "Although the claimant bears the general burden of proving that he is disabled under the statute, 'if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'"  Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

"In reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b).

***Application of Legal Standard***

Dr. Giorgini's and Dr. Tranese's opinions

The ALJ rejected properly Dr. Giorgini's March 11, 2008 conclusion that Morales was "[t]emporarily unemployable," based on Dr. Giorgini's failure to provide a factual basis for his conclusion or a functional assessment, inasmuch as he indicated that Morales's surgery was successful and she was pain free.  Although Dr. Giorgini noted that Morales was unable to stand for long periods of time, he stated she was undergoing physical therapy "for rehabilitation for possible return to work in July, 08 and was improving."  Morales's contention, that the post-March 11, 2008 reports indicate she "did not return to work in July 2008, and that she still remained symptomatic with respect to the left ankle pain and limitations," does not establish that the ALJ's rejection of Dr. Giorgini's finding of Morales's inability to work was erroneous, because the post-March 11, 2008 reports indicating Morales was not pain free do not provide a

basis for Dr. Giorgini's conclusion that Morales was temporarily unemployable on March 11, 2008.  Moreover, whether a claimant is able to work is a determination reserved to the Commissioner, see 20 C.F.R. § 416.927(e), and the ALJ rejected Dr. Giorgini's conclusion on that issue properly.  Morales's August 26, 2008 complaint, at NGDTC, that she had pain in her left ankle since 2007, contradicts directly her treating physician's opinion that she was pain free in March 2008, and no mention exists of Morales's complaints of pain during her June 19, 2008 examination.   Therefore, the ALJ rejected properly Dr. Giorgini's conclusion that Morales was "[t]emporarily unemployable."

The ALJ did not fail "to resolve what he determined to be an inconsistency by Dr. Giorgini in [Morales's] ability to work," as Morales contends, because he did not find any inconsistency; rather, he found that Dr. Giorgini failed to provide a "factual basis or functional assessment" to support his conclusion.  Thus, the ALJ rejected Dr. Giorgini's conclusion about Morales's inability to work because it lacked support, not because it was inconsistent with other evidence.  Furthermore, the ALJ did not mischaracterize Dr. Tranese's opinion, as Morales claims, since the ALJ did not state that he adopted it in its entirety.

<u>The ALJ's Failure to Perform a Physical Abilities Function-by-Function Analysis</u>

Pursuant to a social security policy interpretation ruling, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR §§ 404.1545 and 416.945.  Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996).  "A limited ability to perform certain physical demands of work activity, such as sitting, standing,

26

walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching, may reduce [the claimant's] ability to do past work and other work."  20 C.F.R. § 416.945(b).

> In assessing [residual functional capacity], the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.
>
> SSR 96-8P, 1996 WL 374184, at *7.

Morales is correct when she asserts that the ALJ did not perform, as he was required to do, a function-by-function analysis of her physical abilities, and only recited her physical abilities "in the opening paragraph of his step four analysis."  Notwithstanding the requirement to perform a function-by-function analysis in connection with Morales's work-related physical abilities before reaching a conclusion on her residual functional capacity, the Commissioner argues that "courts in this District have declined to impose such a requirement," making citation to Novak v. Astrue, 07 Civ. 8435, 2008 WL 2882638 (S.D.N.Y. July 25, 2008) and Casino-Ortiz v. Astrue, 06 Civ. 0155, 2007 WL 2745704 (S.D.N.Y. Sep. 21, 2007).  The court in Novak determined that

> the A.L.J. discussed all of the evidence in detail-including the results of MRIs, physician evaluations, and Novak's testimony regarding his regular level of activity-before concluding that 'although heavy lifting, pushing and pulling are precluded . . . [Novak] remains able to lift, push and pull . . . ten pound objects . . . [and] there are no positive findings that indicate he is unable to sit, stand and walk throughout the workday.'  The A.L.J.'s [residual functional capacity] determination requires no further detail.
>
> Novak, 2008 WL 2882638, at *3.

Unlike in Novak, where the ALJ discussed evidence related to each function before making a

conclusion about the limitation of each function, here, the ALJ did not discuss evidence in

connection with each function or discuss in any detail Morales's function-by-function physical

abilities.  Rather, the ALJ made conclusory statements about Morales's physical abilities,

without reference to the evidence, after he concluded that she had the residual functional

capacity to perform light exertional work.

>    In Casino-Ortiz, the court stated:
>
>    Before reaching his final residual functional capacity determination, the ALJ
>    discussed the plaintiff's medical records, the consultative reports, the state agency
>    medical examiner's report, and the plaintiff's testimony and allegations. . . . He
>    specifically found that the evidence demonstrated the plaintiff's ability to perform
>    "up to 6 hours of walking/standing per work day and lifting or carrying no more
>    than 10 pounds frequently and 20 pounds on occasion." . . . The ALJ stated that
>    his decision concurred with the consultative examinations and the state agency
>    review report, all of which made specific findings as to the plaintiff's ability to
>    perform work related functions.  The decision may not have the specificity of a
>    function-by-function analysis, but it is certainly not conclusory.
>
>    Casino-Ortiz, 2007 WL 2745704, at *14.

Unlike in Casino-Ortiz, where the ALJ's assessment of the claimant's residual functional

capacity was not conclusory, because the ALJ discussed the evidence demonstrating the

claimant's physical abilities, no such discussion of evidence concerning Morales's physical

abilities occurred here.  Rather, despite the ALJ's lengthy discussion of Morales's symptoms and

an evaluation of the medical evidence, no discussion about Morales's physical abilities to

perform the physical demands of work activity, such as sitting, standing, walking, lifting,

carrying, pushing, pulling, or other physical functions, occurred here.  The only exception is the

ALJ's mention of Dr. Tranese's findings that Morales has "moderate limitations with stair

climbing and ambulating for extended distances, and mild limitations with prolonged standing."

However, while the ALJ mentioned Morales's limitations with respect to ambulating for

extended distances and prolonged standing, he failed to explain how these limited physical abilities affect Morales's ability to do past work and other work, and he also failed to discuss Morales's other physical abilities.  While some courts in this district may have found that, under certain circumstances, the ALJ need not provide a detailed narrative discussion for each physical function so long as the ALJ's findings about the claimant's limitations with respect to each function are not conclusory, no such finding is warranted here, as the ALJ made only conclusory statements about Morales's physical abilities limitations and did not perform, as he is required to do, a function-by-function analysis before making a conclusion about Morales's residual functional capacity.  Consequently, the ALJ's failure to perform a function-by-function analysis is an error of law[1] requiring remand.

> The ALJ's Failure to Consider the Non-Exertional Impairments

Morales contends that she "testified and the medical records clearly document that she suffers from panic attacks, insomnia, psychosomatic symptoms, is unable to handle stress, and is obese," and the ALJ failed to consider these "non exertional impairments and their effects on her ability to perform work."  Although Morales makes citation to evidence in the record, that evidence does not support the proposition that she is "obese," and the record does not show that Morales has ever been diagnosed with obesity.  Similarly, Morales states that she "has gone to the emergency room on several occasions for her panic attacks," making citation to the April 12, 2007 notes by Dr. Pilowsky.  However, Dr. Pilowsky stated, in his April 12, 2007 notes, that Morales "has been to the ER several times due to intense anxiety," without mentioning the

---

[1] Although the potential for advancing an argument that the ALJ's failure to comply with the Commissioner's regulations is subject to a harmless error analysis might exist, see Kohler, 546 F.3d at 269 (leaving open the possibility that an ALJ's failure to adhere to the regulations might be harmless), no such argument has been made by the Commissioner here.

words "panic attacks."  Moreover, he stated in his diagnosis: "Rule out Panic Disorder."

Morales also contends that Dr. "Pilowsky diagnosed [her] with psychosomatic symptoms that include headaches, pain in her shoulders, neck, and calf muscles, as well as inability to handle stressful situations."  One of the notes to which Morales refers, dated July 17, 2007, (Tr. 296), was not prepared by Dr. Pilowsky, and it does not contain the diagnosis Morales contends it does.  In fact, the person who prepared the note and examined Morales on July 17, 2007, was not certain about the diagnosis because that person stated: "?Fibromyalgia? v. Other."  Moreover, the headaches, pain and swelling in her shoulders, neck and calf muscles, are all complaints Morales communicated to the person who examined her on July 17, 2007, not that person's diagnoses.  Another note to which Morales referred for the proposition that Dr. Pilowsky diagnosed her with psychosomatic symptoms, (Tr. 325), is actually a note by Dr. Orozco, dated October 16, 2008, in which Dr. Orozco noted that Morales "shows multiple somatic complaints," for which he recommended medication and group therapy.  However, the ALJ considered Dr. Orozco's treating records, including his notes on Morales's somatic symptoms.

Dr. Pilowsky noted, on July 12, 2007, (Tr. 297), that Morales "remained moderately depressed and very anxious with insomnia and a variety of psychosomatic symptoms such as headaches and rigidity of the neck muscles."  Dr. Pilowsky diagnosed Morales with major depression on July 12, 2007.  Morales's contention that her psychosomatic symptoms are "severe impairments" which the ALJ did not mention in his decision does not demonstrate that the ALJ did not consider the psychosomatic symptoms noted by Dr. Pilowsky, and it does not establish that the ALJ erred in not finding her psychosomatic symptoms to be severe impairments.  On the contrary, the ALJ considered Dr. Pilowsky's opinion, accorded it proper

30

weight and noted Dr. Pilowsky's diagnoses throughout the course of Morales's treatment.
Therefore, the ALJ's failure to mention Morales's psychosomatic symptoms specifically is not a
legal error.

      Errors Concerning the VE's Testimony

      Morales's argument that the ALJ's hypothetical question to the VE did not include "the
limitation of an inability to travel, and the functional limitations of frequent panic attacks," is
meritless.  The ALJ's hypothetical question to the VE was proper because it was based on his
residual functional capacity determination.  The ALJ did not find that Morales was unable to
take public transportation and suffered from panic attacks; consequently, he was not required to
include those limitations in his hypothetical question to the VE.  Although the job of a marker
requires an individual to record and print information, as well as compare printed price tickets
with entries on purchase orders to verify accuracy and notify a supervisor of discrepancies, see
DOT 209.587-034, this last task is inconsistent with the hypothetical person's inability to
communicate in English.  In any event, any error on the VE's part, concerning the ability of a
non English speaker to meet this requirement, was cured by the ALJ's finding that Morales is
actually able to communicate in English.

      However, the VE's testimony that a worker who is unable to maintain concentration and
attention for more than 30 minutes at a time could do the work identified by the VE, or "any
work in the national or regional economy," is contrary to the Social Security Administration's
policy, which provides that one of the mental abilities needed for any job is the "ability to
maintain concentration and attention for extended periods (the approximately 2-hour segments
between arrival and first break, lunch, second break, and departure)."  See Program Operations
Manual System DI 25020.010.  The VE did not explain, as she was asked to do by the ALJ, what

impact the person's inability to maintain concentration and attention for longer than thirty minutes at a time would have on the jobs the VE mentioned.  The VE simply stated, in a conclusory fashion, that such a person could do the work mentioned or any other work.  Thus, the ALJ's reliance on the VE's testimony, that a person who is unable to maintain concentration and attention for more than 30 minutes at a time would be able to do the jobs the VE mentioned as well as any work in the national or regional economy, was erroneous.

<u>Treating Physician's Opinions and Duty to Develop the Record</u>

Morales's contention that the ALJ failed to state what weight he accorded to the opinions of her treating physicians: Dr. Giorgini, Dr. Pilowsky and Dr. Orozco, is meritless.  The ALJ gave controlling weight to the treating physicians' opinions, except where he indicated specifically that he did not; and, in those instances, he explained why.  Morales did not identify where in the ALJ's decision he did not give controlling weight to Dr. Orozco's and Dr. Pilowsky's opinions.  In fact, apart from rejecting properly Dr. Pilowsky's conclusion that Morales was "[t]emporarily unemployable," the ALJ stated specifically that he adopted and incorporated Dr. Pilowsky's assessments in his determination of Morales's residual functional capacity.  The ALJ also explained what weight he gave to Dr. Giorgini's opinion and why. Therefore, the ALJ committed no error with respect to the treating physicians' opinions.

As discussed above, the ALJ did not perceive any inconsistency in Morales's treating physicians' opinions that needed to be clarified.  Moreover, the Appeals Council determined properly that the evidence submitted to it by Morales provided no basis to change the ALJ's opinion because it either did not relate to the relevant period, which ended on April 7, 2009, or was not contrary to the weight of the evidence.

Morales's contention that the Appeals Council should have remanded the case to the ALJ

to develop the record, in connection with her August 3, 2009 podiatric surgery, is meritless.  The Appeals Council was not required to consider Morales's evidence regarding her August 3, 2009 surgery, or to remand the case to the ALJ to develop the record in connection with that surgery, because that evidence relates to the period after the ALJ's April 7, 2009 decision.  See 20 C.F.R. § 416.1470(b).

### The ALJ's Credibility Determination

The ALJ's credibility determination, with respect to Morales, is entitled to deference because the ALJ observed her demeanor and behavior at the administrative hearing.  See Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the Secretary, not [the reviewing courts], . . . to appraise the credibility of witnesses, including the claimant.").  The ALJ considered, as he was required to do, the entire record, as well as his own observation of Morales's demeanor and behavior at the hearing when determining Morales's credibility.  He gave specific reasons why he found that Morales's "statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment."  The ALJ identified evidence in the record with which Morales's testimony was inconsistent, before concluding that "her subjective complaints of disabling symptoms are exaggerated and cannot be reasonably accepted."  Accordingly, the ALJ's credibility determination was not erroneous and was supported by substantial evidence.

## RECOMMENDATION

For the foregoing reasons, I recommend that: (1) the defendant's motion for judgment on the pleadings, Docket entry No. 13, be denied; (2) the plaintiff's cross-motion for judgment on the pleadings, Docket Entry No. 23, be denied; and (3) the matter be remanded to the

Commissioner for further proceedings.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Barbara S. Jones, 500 Pearl Street, Room 1920, New York, New York, 10007, and to the

chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007.  Any

requests for an extension of time for filing objections must be directed to Judge Jones.  *Failure*

*to file objections within fourteen (14) days will result in a waiver of objections and will*

*preclude appellate review*.  See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v.

Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
       January 17, 2012

Respectfully submitted,

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

34